## UNITED STATES  DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

ANDREW ROBERTS                                            CIVIL ACTION

VERSUS                                                    NO.  15-963

N. BURL CAIN, WARDEN                                      SECTION "I"(5)

### REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2).  For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

### I. *Procedural History*

Petitioner, Andrew Roberts, is a state prisoner incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.  On May 12, 2010, Roberts was charged by grand jury indictment with second degree murder pursuant to Louisiana Revised Statute 14:30.1.[1] He was found guilty by a jury after a three-day jury trial on August 17, 2011.[2] Following the denial of

---

[1] State Rec., Vol.  1 of 6, Bill of Indictment, St. Tammany Parish Grand Jury.

[2] *Id*., Minute Entry of August 17, 2011 and Verdict.

his motions for a new trial and for post-verdict judgment of acquittal, he was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence on September 23, 2011.[3]  He moved for reconsideration of the sentence, which was denied.

Roberts appealed his conviction and sentence to the Louisiana First Circuit Court of Appeal.  He asserted that the evidence was insufficient to support the verdict and the trial court erred in denying his motion for a post-verdict judgment of acquittal.  On June 8, 2012, the court of appeal affirmed his conviction and sentence.[4]  On November 9, 2012, the Louisiana Supreme Court denied relief.[5]

On April 17, 2013, Roberts filed an application for post-conviction relief in the state district court.[6]  In that application, he raised three claims for relief:  (1) appellate counsel was ineffective for failing to challenge the trial court's denial of his motion to suppress; (2)

---

[3] State Rec., Vol. 1 of 6, Minute Entry of September 23, 2011; State Rec., Vol. 3 of 6, Sentencing Transcript, pp. 6-7.

[4] *State v. Roberts*, 2011-KA-2248, 2012 WL 2061519 (La. App. 1st Cir. 6/8/12) (unpublished decision) (State Rec., Vol. 4 of 6).

[5] *State v. Roberts*, 2012-KH-1655 (La. 11/9/12), 100 So.3d 834; State Rec., Vol. 5 of 6.

[6] State Rec., Vol. 4 of 6, Uniform Application for Post-Conviction Relief signed and dated April 17, 2013.   Federal *habeas* courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006). If that date cannot be determined, the Court considers the signature date of the application or the file-stamp placed on the document by the clerk of court.

ineffective assistance of trial counsel for failing to object to the trial court's exclusion of the responsive verdict of manslaughter; (3) the exclusion of manslaughter as a responsive verdict denied him due process and a fair trial.   The state district court denied the application for post-conviction relief on June 14, 2013.[7]

On July 2, 2013, Roberts filed a related supervisory writ application in the Louisiana First Circuit Court of Appeal.[8]   By order signed November 4, 2013, the Louisiana First Circuit denied the writ application on the showing made.[9]   The application was denied because it failed to comply with the Uniform Rules of the Courts of Appeal and did not include "a copy of all pertinent minute entries and/or transcripts, the indictment, the state's answer, if any, and any other portions of the district court record that might support the claims raised...." However, the appellate court order also provided Roberts until December 30, 2013 to file a new, compliant application.

On December 5, 2013, Roberts filed a second supervisory writ application in the

---

[7] State Rec., Vol. 4 of 6, District Court Order dismissing application for post-conviction relief on June 14, 2013.

[8] State Rec., Vol. 6 of 6, Louisiana First Circuit Application for Supervisory Writ of Review, No. 2013-KW-1137.

[9] *Id.*, *State v. Roberts*, 2013-KW-1137 (La. App. 1st Cir. Nov. 4, 2013) (unpublished writ decision).

Louisiana First Circuit.[10]  On March 21, 2014, the court of appeal denied the writ application without stated reasons.[11] On April 9, 2014, Roberts filed a related supervisory writ application with the Louisiana Supreme Court.[12]  On January 16, 2015, the Louisiana Supreme Court denied his related writ application without reasons assigned.[13]

On March 10, 2015, Roberts filed his federal application for *habeas corpus* relief.[14]  As grounds for relief, he asserts that the evidence was insufficient to support the verdict and the trial court should have granted the motion for post-verdict judgment of acquittal; ineffective assistance of appellate and trial counsel; and the denial of due process and a fair trial based on the exclusion of the responsive verdict of manslaughter.  The State filed a response in opposition, asserting that the application is untimely and Roberts has failed to exhaust state court remedies.  Alternatively, the State argues that the petition should be dismissed on the

---

[10] State Rec., Vol. 6 of 6, Louisiana First Circuit Application for Supervisory Writ of Review, No. 2013-KW-2136.

[11] State Rec., Vol. 4 of 6, *State v. Roberts*, 2013-KW-2136 (La. App. 1st  Cir. Mar. 21, 2014) (unpublished writ decision).

[12] State Rec., Vol. 6 of 6, Louisiana Supreme Court Application for Supervisory Writ, No. 14-KH-845.

[13] *State ex rel. Roberts v. State*, 2014-KH-0845 (La. 1/16/15), 157 So.3d 1125; *see also* State Rec., Vol. 6.

[14] Rec. Doc. No. 1, Petition for writ of *habeas corpus* pursuant to 28 U.S.C. §2254. "A prisoner's *habeas* application is considered 'filed' when delivered to the prison authorities for mailing to the district court." *Roberts v. Cockrell*, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Roberts signed the application on March 10, 2015.

merits.

## II. *Timeliness and Exhaustion*

Threshold questions in *habeas* review are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court (*i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim). *Nobles v. Johnson*, 127 F.3d 409, 419–20 (5th Cir.1997) (citing 28 U.S.C. § 2254(b), (c)). For the following reasons, the Court finds that the petition is timely filed and the claims are properly exhausted.

The State notes correctly that Roberts' conviction became final on February 7, 2013 (90 days after the Louisiana Supreme Court denied his writ application on November 9, 2012). *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir.1999). The one-year period ran for 74 days until he signed his state court post-conviction application on April 23, 2013. That application was denied on June 14, 2013. The State argues that tolling ceased entirely thirty (30) days after the state district court denied the application for post-conviction relief, because Roberts' supervisory writ application to the Louisiana First Circuit was not properly filed in accordance with state law. As a result, the State submits it did not serve to toll the statute of limitations and his time for filing then ran uninterrupted until it expired on May 2, 2014. Given the procedural defect in his initial supervisory writ application, the State also asserts that Roberts did not fairly present the claims to the courts of appeal, and therefore failed to exhaust his state court remedies. However, neither argument advanced by the State addresses the import

or effect of the appellate court ruling that explicitly afforded Roberts until December 30, 2013 to file a new writ application, or the fact that Roberts thereafter timely filed a new supervisory writ application, as permitted, within the allotted time frame.

Although Roberts' initial timely application for supervisory review in the Louisiana First Circuit was deemed improperly filed and denied because it did not comply with state procedural rules that required inclusion of specified documents, the state court's ruling may clearly be considered as implicitly granting an extension of time for Roberts to file his writ application. *See Dixon v. Cain*, 316 F.3d 553, 554 (5th Cir.2003) (concluding that when a petitioner files a notice of intent to seek supervisory review within the 30–day time period, and the trial court sets a return date outside the 30–day time period, the court has effectively granted the petitioner an extension of time to file his writ application). Here, the appellate court ruling provided: "In the event relator elects to file a new application with this Court, the application must be filed on or before December 30, 2013." Roberts complied with the appellate court's ruling and filed his second application within the specified time period. That application was not denied for procedural reasons, but instead appears to be a ruling on the merits.

Even if Roberts received no tolling credit for his initial state court post-conviction application filed with the Louisiana First Circuit because it failed to comply with state procedural rules, tolling would recommence either on the date of the First Circuit ruling granting the extension, or at the very latest, on the date he filed the second supervisory writ

6

application.  In either event, the instant federal application would be timely filed.  Under the circumstances, and absent any authority cited by the State to the contrary, the application was timely and properly filed for purposes of tolling the federal one-year limitations period.  *See Holton v. Cain*, Civ. Action No. 11-749, 2014 WL 3189737, at *6 (M.D. La. July 8, 2014) (finding that appellate court's writ ruling that provided petitioner a later deadline for filing writ application that complied with procedural requirements was an implicit extension of time for purposes of tolling the one-year federal limitations period).  Furthermore, contrary to the State's position, Roberts fairly presented and exhausted the three claims for relief raised in the second supervisory writ application filed with the Louisiana First Circuit and thereafter in his writ application to the Louisiana Supreme Court.  The undersigned will therefore consider the merits of Roberts' claims.

### III. *General Standards of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal *habeas* court's role in reviewing state prisoner applications in order to prevent federal *habeas* 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal

7

court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law or mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning. *Bell*, 535 U.S. at 694.

A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state

court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir.2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA." *Harrington v. Richter*, 562 U.S. 86 (2011). Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. at 102; emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal *habeas corpus* review as a vehicle to second-guess the reasonable decisions of state courts.").

IV. *Facts*

On direct appeal, the Louisiana First Circuit summarized the facts as follows:

The victim, Ruby Ann Boland, aged twenty-two months, lived in a trailer with her mother, Helen Teal, and the defendant, who was not the child's father, next to Teal's parents' home in Slidell. On April 1, 2010, the victim was in the care of

9

the defendant while Teal was at work. On that day, the defendant brought the victim to Teal's parents' home to visit Teal's mother, Ruby Teal. The victim was in normal condition when the defendant left the home with her. Thereafter, the defendant ran back to the home, holding the victim in his arms. According to Ruby Teal, the victim's "arms were out and feet were hanging." She was gasping for air, "her eyes were rolled kind of up, slightly open." The defendant told Ruby Teal that the victim had fallen off the sofa.

The victim was transported to Northshore Regional Medical Center. Ruby Teal followed the ambulance to the hospital, but did not see the defendant there at any time she was present. Thereafter, she was informed that the victim was brain dead.

In his initial account of what happened to the victim, the defendant claimed he brought her back to the trailer to change her on the sofa. He stated he changed the victim's diaper and left her on the sofa while he went to the bathroom. He claimed he heard a "thump" while he was in the bathroom and returned to find the victim on the floor. He stated he then ran to Ruby Teal's home with the victim. The defendant denied seeing any bruises on the victim.

On April 5, 2010, the defendant changed his account of the incident. He claimed the victim had been injured when he stood her up and she "slid out the pants." He then stated she hit her head on the ground after he "was trying to shake her out the pants." When confronted with the fact that his account of the incident was inconsistent with the lack of neck injury to the victim, the defendant stated the victim's head had hit the ground four or five times while he was trying to shake her out of her pants.

On April 6, 2010, when confronted by the injuries suffered by the victim, the defendant claimed he had been playing with the victim and head butting her belly, and she struck her head on the floor and "started twitching" when he bent over with her. He then stated a drug dealer, "Mike," had held him at gunpoint in the trailer, grabbed the victim and hit her in the head because the defendant owed him money.

At trial, the State presented testimony from St. Tammany Parish Chief Deputy Coroner and Forensic Pathologist Dr. Michael B. DeFatta. He performed an autopsy on the victim. She had two recent bruises on her forehead. She had an older bruise on her left cheek. She had bruising on the bottom of her feet. She

10

also had a recent bruise on the left side of her rib cage. She had a very large area of bruising extending from the very top of her head to the front of her head. The bruising was of "different gradations" and "different shapes." Dr. DeFatta testified the bruising was more consistent with multiple impacts, rather than a single impact.

The victim had no skull fractures, but hemorrhage and subarachnoid hemorrhage was present in her brain. Dr. DeFatta testified that "sufficient trauma" to the blood vessels in the brain would cause those vessels to rupture, resulting in bleeding on top of the brain and under the arachnoid layer. Hemorrhage was also present under the bruise on the left side of the victim. Additionally, hemorrhage was present in the optic nerves behind the victim's eyes. Dr. DeFatta testified this hemorrhage was indicative of "some type of rotational injury."

In Dr. Defatta's opinion, the injuries to the victim's head resulted from blunt force trauma. He testified those injuries were inconsistent with the victim falling from a sofa. According to Dr. DeFatta, the injuries to the victim's feet were also consistent with blunt force trauma, *i.e.*, being hit by someone or something. He stated, "I've never seen kids, adults, teenagers, anyone that walked on rocks that had injuries like that on the bottom of their feet."Dr. DeFatta indicated the records of the victim's clinical visits and hospital records revealed no history of seizure disorder. He testified the victim's cause of death was blunt force head trauma as a result of child abuse, and her manner of death was homicide.

The defense presented testimony from Dr. Thomas William Young, a board certified forensic pathologist. He indicated he was being paid $300 per hour for his services, but not his opinion. He testified, "It is my opinion, made to a reasonable degree of medical certainty, that the child, Ruby Boland, had seizures, epilepsy, fits. There are some children who are basically born and they develop problems with seizures."In Dr. Young's opinion, the victim's cause of death was complications of a seizure, and she died a natural death.

According to Dr. Young, the bleeding suffered by the victim was due to damage to her brain as a result of lack of oxygen. He indicated the bruising on the victim's body resulted from her being moved around at the hospital after her brain was damaged. He claimed the victim's mother stated she had not noticed the injuries until the victim was moved to the hospital. He stated the bruising

11

to the bottom of the victim's feet resulted from the doctors at the hospital using a reflex hammer to see if the victim had any reflexes. He noted the victim's skull was not broken, and testified "it only makes any kind of common sense that if you basically have trauma to the head, you're going to break the skull."[15]

V. *Claims for Relief*

A. *Sufficiency of the evidence and denial of post-verdict judgment of acquittal*

In his first two claims for relief, Roberts asserts that the evidence was insufficient to support his conviction for second degree murder.[16]  He argues that the physical evidence directly contradicts his confession and the State's theory of the case, and "except for Mr. Roberts' suspect confession, the State's case was constructed entirely of circumstantial evidence."[17] Contrary to Roberts' suggestion, the appellate court recognized that the evidence at trial consisted of both direct and circumstantial evidence, which the court found was sufficient for any rational trier of fact to find him guilty beyond a reasonable doubt of second degree murder.  In rejecting the claims on direct review, the state court held:

---

[15] *State v. Roberts*, 2012 WL 2061519, at *1-2.

[16] To the extent Roberts may claim that the state trial court improperly denied his motion for post-verdict judgment of acquittal under state law, that claim does not warrant federal *habeas corpus* relief. A state court's denial of that type of post-trial motion does not violate a federal constitutional right. *Haygood v. Quarterman*, 239 F. App'x 39, 42 (5th Cir.2007) (citing *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir.1991)). A federal court does "not sit as [a] 'super' state supreme court in a *habeas corpus* proceeding to review errors under state law." *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir.1994) (citation and quotation omitted); *see Swarthout v. Cooke*, 131 S.Ct. 859, 861 (2011) (federal *habeas* review does not lie for errors of state law).

[17] Rec. Doc. 4, p. 31.

The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove, in order to convict," every reasonable hypothesis of innocence is excluded. *State v. Wright*, 98–0601 (La. App. 1 Cir. 2/19/99), 730 So.2d 485, 486, *writs denied*, 99–0802 (La.10/29/99), 748 So.2d 1157, 00–0895 (La.11/17/00), 773 So.2d 732 (quoting LSA–R.S. 15:438).

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *Wright*, 730 So.2d at 487.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. LSA–R.S. 14:30.1(A)(1). Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA–R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. *State v. Henderson*, 99–1945 (La.App. 1 Cir. 6/23/00), 762 So.2d 747, 751, *writ denied*, 00–2223 (La.6/15/01), 793 So.2d 1235.

Second degree murder is also the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of cruelty to juveniles.LSA–R.S. 14:30.1(A)(2). Cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. LSA–R.S. 14:93(A)(1).

13

Once the crime itself has been established, a confession alone may be used to identify the accused as the perpetrator. *State v. Carter*, 521 So.2d 553, 555 (La. App. 1st Cir.1988).

After a thorough review of the record, we are convinced that any rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant's identity as the perpetrator of that offense. The verdict rendered in this case indicates the jury rejected the defense theory that the victim died of natural causes. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. *State v. Moten*, 510 So.2d 55, 61 (La. App. 1 Cir.), *writ denied*, 514 So.2d 126 (La.1987). No such hypothesis exists in the instant case. The verdict rendered also indicates the jury accepted the testimony of Dr. DeFatta and rejected the testimony of Dr. Young. This court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Lofton*, 96–1429 (La. App. 1 Cir. 3/27/97), 691 So.2d 1365, 1368, *writ denied*, 97–1124 (La.10/17/97), 701 So.2d 1331. Further, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. *See State v. Ordodi*, 06–0207 (La.11/29/06), 946 So.2d 654, 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *State v. Calloway*, 07–2306 (La.1/21/09), 1 So.3d 417, 418 (per curiam).

This assignment of error is without merit.[18]

The Louisiana Supreme Court denied his related writ application without assigning additional

---

[18] *Roberts*, 2012 WL 2061519, at * 3-4.

reasons.

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Taylor v. Day*, Civ. Action No. 98–3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), *aff'd*, 213 F.3d 639 (5th Cir.2000). For the following reasons, the Court finds that Roberts has made no such showing.

The court of appeal applied the standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under *Jackson*, a federal *habeas* court addressing an insufficiency of the evidence claim must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Williams v. Cain*, 408 F. App'x 817, 821 (5th Cir.2011); *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir.2008). The proper focus under *Jackson* is not "whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir.2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)) (emphasis added); *see also Cavazos v. Smith*, 132 S.Ct. 2, 4 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.... Because

rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."). Moreover, because the state court's decision applying the already deferential *Jackson* standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." *Parker v. Matthews*, 132 S.Ct. 2148, 2152 (2012); *see also Coleman v. Johnson*, 132 S.Ct. 2060, 2062 (2012).[19]

Under Louisiana law, second degree murder is defined in pertinent part as the "killing of a human being: (1) when the offender has a specific intent to kill or inflict great bodily harm; or (2) when the offender is engaged in the perpetration or attempted perpetration of ... cruelty to juveniles ... even though he has no intent to kill or to inflict great bodily harm."  La. R.S. 14:30.1(A).  Louisiana law defines cruelty to juveniles as "the intentional or criminally

---

[19] The Court notes that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does not apply in federal *habeas corpus* proceedings.  In these proceedings, only the *Jackson* standard need be satisfied, even if state law would impose a more demanding standard of proof. *Foy v. Donnelly*, 959 F.2d 1307, 1314 n. 9 (5th Cir.1992); *Higgins v. Cain*, Civ. Action No. 09–2632, 2010 WL 890998, at *21 n. 38 (E.D. La. Mar. 8, 2010), *aff'd*, 434 F. App'x 405 (5th Cir.2011); *Williams v. Cain*, No. 07–4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 F. App'x 817 (5th Cir.2011); *Davis v. Cain*, Civ. Action No. 07–6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); *Wade v. Cain*, Civ. Action No. 05–0876, 2008 WL 2679519, at *6 (W.D.La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), *aff'd*, 372 F. App'x 549 (5th Cir. Apr. 9, 2010); *see also Coleman*, 132 S.Ct. at 2064 ("Under *Jackson*, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." La. R.S. 14:93(A)(1).

The evidence introduced at trial included testimony by the state's expert, St. Tammany Parish Deputy Coroner Dr. Michael DeFatta, who opined based on his review of the medical evidence and personal autopsy examination of the victim that the victim died of blunt force head trauma from child abuse, and Roberts' recorded statement to police which included several different accounts of the incident and his admission after being confronted with evidence of the victim's physical injuries to striking the 22-month-old's head against the ground multiple times.[20]  The defense's hired expert forensic pathologist, Dr. Thomas Young, disagreed with Dr. DeFatta and offered his contrasting opinion, based solely on his review of the documented medical evidence and lack of any skull fractures, that the victim died from a seizure rather than any trauma to the head.[21]  The jury was free to weigh the conflicting testimony and accept Dr. DeFatta's expert opinion over that of Dr. Young and reject the defense's theory that the victim died of natural causes.  A federal *habeas* court may not substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the jury, and where, as in this case, a petitioner's insufficient evidence claim turns on a

---

[20] State Rec., Vol. 3 of 6, Trial Transcript (Dr. DeFatta), pp. 481-485;(Detective Alvin Hotard), p. 453 (recordings played for the jury)

[21] *Id.*, Trial Transcript (Dr. Young) at pp. 560-562.

credibility determination, a federal *habeas* court generally will not grant relief. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995).

The evidence in this case, viewed in the light most favorable to the prosecution, was sufficient for any rational trier of fact to find that the State satisfied the elements necessary to prove second degree murder. Therefore, Roberts cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He is not entitled to relief on this claim.

B. *Omission of responsive verdict*

Roberts claims that the trial court erred in excluding the responsive verdict of manslaughter when charging the jury. Under Louisiana law, both manslaughter and negligent homicide are included as legislatively authorized lesser responsive verdicts to a charge of second degree murder. La. C.Cr.P. art. 814(A)(3). In the instant case, the trial court charged the jury only as to negligent homicide and omitted manslaughter as a responsive verdict.[22] Roberts asserts that even if the trial court excluded the responsive verdict as agreed upon by counsel, that omission violated his right to due process and a fair trial.[23]

---

[22] State Rec., Vol. 3 of 6, Trial Transcript, pp. 644-645.

[23] A charge conference was held and counsel for the State and the defense approved the charges. Counsel for the State noted, "[w]e agreed to take some things out obviously pursuant to the agreement." State Rec., Vol. 3 of 6, pp. 542-543.

Federal *habeas corpus* relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice. 28 U.S.C. § 2254; *Engle v. Issac*, 456 U.S. 107, 119 (1983). A claim that a trial court gave an improper jury instruction under state law is not cognizable on *habeas* review absent a showing that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 75, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (erroneous jury instructions may not serve as the basis for *habeas* relief unless they have "so infused the trial with unfairness as to deny due process of law").

To the extent Roberts asserts his due process rights were violated when the trial court failed to charge the jury as to manslaughter, it is less than clear that he had any federal right to such an instruction.  There is no clearly established Supreme Court authority requiring lesser included offense instructions in noncapital cases. *See Beck v. Alabama*, 447 U.S. 625, 638 n. 14, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) (The Supreme Court left open the question whether the Due Process Clause is violated when a lesser included offense is omitted from jury consideration in a noncapital case).  The Fifth Circuit has held generally in noncapital cases, the failure to include a responsive verdict does not violate federal law. *Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir.1988); *Alexander v. McCotter*, 775 F.2d 595, 601 (5th Cir.1985); *see also Weatherspoon v. Cain*, Civ. Action No. 10-4500, 2011 WL 4351397, at *25 (E.D. La. July 8, 2011), *adopted*, 2011 WL 4063611 (E.D.La. Sept. 13, 2011); *Jason v. Cain*, Civ. Action No. 04–0882, 2006 WL 2949523, at *14 (E.D. La. Oct. 13, 2006) ("The failure to include a responsive verdict

in a noncapital case does not violate federal law.").  Therefore, Roberts' claim that the state trial court improperly omitted the responsive charge of manslaughter does not raise a federal constitutional question.

C.  *Ineffective assistance of counsel*

Roberts asserts he received ineffective assistance of counsel at trial and on appeal.  He claims that his trial attorney was ineffective in failing to object when the trial court omitted manslaughter as a responsive verdict to the charge of second degree murder.  He argues that appellate counsel was ineffective for failing to challenge the trial court's denial of the motion to suppress the confession.  The state district court summarily rejected these claims first raised in his state-court post-conviction relief application.  The appellate courts denied his related applications for supervisory writs without assigning reasons.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel. Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir.1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir.2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e.* deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without

20

addressing the other prong. *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir.2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir.1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir.1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir.1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel. In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."*Strickland*, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."*Id*. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative

21

role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793. On the other hand, to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation. *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir.2001); *see also Smith v. Robbins*, 528 U.S. 259, 286 (2000). Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error. *Briseno*, 274 F.3d at 210.

Because the state courts rejected petitioner's ineffective assistance of counsel claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir.2002). Moreover, the United States Supreme Court has held that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is doubly deferential. *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (citing *Burt v. Titlow*, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011).

As for trial counsel's failure to object when the trial court omitted the responsive verdict of manslaughter, the failure did not amount to deficient performance and Roberts

suffered no prejudice as a result.  Even assuming counsel chose to exclude the responsive verdict, a decision not to offer a jury instruction on a lesser included offense falls within the realm of trial strategy.  *Jason v. Cain*, Civ. Action No. 04-0882, 2006 WL 2949523, at *14–17 (E.D. La. 2006) (citing *Lake v. Portuondo*, 14 F. App'x. 126, 128 (2nd Cir.2001) ("A decision to forgo a charge on lesser included offenses is strategic in nature.")).  Here, counsel made a tactical decision not to include the responsive verdict of manslaughter as part of a reasonable trial strategy.  He obviously sought to convince the jury that Roberts was not guilty of second degree murder because the medical evidence showed the victim died from natural causes and not any mistreatment at the hands of Roberts.  He presented contrasting expert testimony in support of the defense theory that absent any evidence of skull fractures, the victim could not have sustained the head trauma suggested by the prosecution as inflicted by Roberts, and instead offered a convincing alternate theory as to how the victim died that supported Roberts' initial version of the incident he related to police and the victim's injuries. The goal was to gain an acquittal or at the very least a responsive verdict of negligent homicide, which was presented to the jury.  Offering the jury a possible manslaughter verdict based on slim and unconvincing evidence of provocation would have confused the jury and negated the defense theory and likelihood of outright acquittal or greatly reduced sentence if he was convicted of negligent homicide.  The mere fact that the strategy proved unsuccessful is not evidence that counsel performed deficiently.  *See Bell v. Epps*, No. 08–70031, 347 F. App'x 73, 79 (5th Cir. 2009) (unpublished) (holding that reviewing courts must make "every effort to account for

the distorting effect of hindsight on ultimately unsuccessful trial decisions") (quoting *Strickland*, 466 U.S. at 689).  Furthermore, given the trial strategy, the evidence would not have supported a verdict of manslaughter and therefore the agreed-upon exclusion of the responsive verdict of manslaughter would have been proper.  *See* La. C.Cr.P. art. 814(C); *State v. Newton*, 973 So.2d 916, 919 n. 2 (La. App. 2nd Cir.2007) ("If there is no evidence reasonably supporting a verdict, then such a verdict may be excluded as a possible responsive verdict."); *State v. Loyden*, 899 So.2d 166, 173 (La. App. 3rd Cir.2005) (same).  There is no evidence that counsel's decision to forgo the responsive verdict of manslaughter fell below the conduct of a reasonably competent attorney. *Strickland*, 466 U.S. at 687.

Nor has he established prejudice by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*.  Roberts implies that the jury's question to the court during deliberations regarding the penalty for negligent homicide shows that jurors sought a compromise verdict and would have found him guilty of manslaughter, rather than second degree murder, had it been offered. However, the unanswered juror question with respect to negligent homicide does not offer any insight into the potential for a verdict of manslaughter based on the evidence presented at trial.[24] Roberts' speculation in this regard is unconvincing and insufficient to demonstrate the requisite prejudice under *Strickland*.  The state district court's decision rejecting the claim of

---

[24] The trial court's response to the inquiry was simply that sentencing was not the function of the jury. State Rec., Vol. 3, Trial Transcript, p. 648.

ineffective assistance of trial counsel in this regard was neither contrary to nor involved an unreasonable application of clearly established federal law.

Next, Roberts claims that appellate counsel provided ineffective assistance when he failed to challenge the trial court's denial of the motion to suppress his confession. He argues that appellate counsel's failure to raise the claim on direct appeal had a devastating effect on his right to a fair trial because the confession was the most damaging piece of evidence. This claim was raised in his state post-conviction application and rejected on the merits.

The admissibility of a confession is a mixed question of law and fact. *Miller v. Fenton*, 474 U.S. 104, 112 (1985); *ShisInday v. Quarterman*, 511 F.3d 514, 522 (5th Cir.2007) (citing *Miller*, 474 U.S. at 112). A federal court on *habeas* review must respect the state court's determination of voluntariness as long as it was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); *Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir.1998). In doing so, a federal *habeas* court must afford a presumption of correctness to state courts' findings of fact if they are fairly supported by the record. *Miller*, 474 U.S. at 117.

There are two inquiries to determine whether an accused has voluntarily and knowingly waived his Fifth Amendment privilege against self-incrimination. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Soffar v. Cockrell*, 300 F.3d 588, 592 (5th Cir.2002). First, waiver of the right must be voluntary and not the product of intimidation, coercion or deception. *Moran*, 475 U.S. at 421. Second, the waiver or relinquishment must be made with full awareness of

25

the nature of the right being waived. *Id*. In making these inquiries, the court must consider the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973). Determining whether officers engaged in coercive tactics to elicit a confession is a question of fact, and the state court's factual findings are entitled to deference when supported by the record. *Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir.1993); *Self v. Collins*, 973 F.2d 1198, 1204 (5th Cir.1992); *see also Miller*, 474 U.S. at 112 (noting that subsidiary questions such as whether the police engaged in coercive tactics are afforded the presumption of correctness).

The record shows that Detective Hotard first interviewed Roberts at the scene on Thursday, April 1, 2010. At that time, Roberts freely and voluntarily explained to officers in an audio-recorded statement that he left the child unattended and she fell off the couch. The story quickly became suspect. Detective Hotard soon learned from the treating physician that child abuse was suspected based on the extent of the victim's injuries, particularly to her head. Detective Hotard then attended the April 3, 2010 autopsy conducted by Dr. DeFatta, who told him that the victim's injuries were inconsistent with Roberts' version of the incident. On Monday, April 5, 2010, Detective Hotard interviewed Roberts again at the police station. The interview was documented by both audio and videotaped recordings. Roberts executed a waiver of rights form and made several inculpatory statements to police during the course of the interview. The inculpatory statements made during this interview form the basis of Roberts' *habeas* claim.

26

In denying the motion to suppress, the trial court noted that the April 1, 2010 audiotaped statement was not part of any custodial interrogation.  As to the April 5, 2010 statements, the trial court found that Roberts was adequately advised of his rights and knowingly and intelligently waived them.  The court also found that the statements given during the interview were not obtained through the use of any force, coercion or intimidation of any kind.

Importantly, Roberts does not dispute that he understood the rights he was waiving and that he did so knowingly.  He argues that his April 5, 2010 confession was involuntary and that police officers used force to coerce his statements.  He asserts he made the statements only after he was beaten by the police.

The trial court's finding that the confession was voluntary and did not result from police misconduct is supported by the record.  The transcript of the evidentiary pretrial suppression hearing reflects that Roberts' inculpatory statements were not the result of any coercive tactics or physical force by the police.  Detective Hotard, who conducted the interview, testified that Roberts made the statements voluntarily and willingly when he was confronted with contrary information from their investigation.  Neither audio nor video recordings of the interview supported Roberts' claims of abuse.  Roberts pointed to the fact that the tapes reveal him spitting into a garbage can as evidence of abuse.  However, at the suppression hearing and trial, defense counsel was allowed to question Detective Hotard and

27

explore this occurrence with regard to his coercion claim.[25] Detective Hotard acknowledged this did occur at some point during the interview, but adamantly denied it resulted from any mistreatment by police.  In fact, Roberts indicated to him that he had some sort of problem with his gums.[26]  Detective Hotard asked Roberts if he needed medical attention, but Roberts declined.[27]  Detective Hotard testified that Roberts was given bathroom breaks during the approximate four-hour interview, and at times the detectives needed to leave the room, but at no time during the entire interview was the video recorder stopped. Roberts' allegation that he sustained injury to his ribs from a police beating during interrogation was likewise unsupported.  There was no evidence adduced to support the assertion that Roberts was beaten by police or that the confession was otherwise coerced.

Appellate counsel was not deficient for failing to raise the suppression issue on appeal because it lacked merit.  An appellate counsel's performance may not be deemed deficient for failing to argue a frivolous or non-meritorious claim.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Effective assistance of counsel on appeal does not mean counsel who will raise every

---

[25] State Rec., Vol. 3 of 6, Trial Transcript, pp. 443-448, 456-464.

[26] The medical records introduced at trial by the defense did not support the defense allegation of physical abuse.  Instead they indicated that Roberts' bleeding gums were the result of gingivitis and poor dental hygiene.  Furthermore, a medical intake review on April 6, 2010 documented no subjective complaints by Roberts or objective findings of any physical injuries.  *See* State Rec., Vol. 3 of 6, pp. 626-627.

[27] *Id*. at 465.

nonfrivolous ground of appeal available, but rather counsel performing in a reasonably effective manner. *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir.1998) (citing *Evitts v. Lucey*, 469 U.S. 387, 394 (1985) (appellate counsel "need not advance every argument, regardless of merit, urged by the appellant")).  Counsel is not required to raise even "nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points."  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

Given the substantial evidence in the record to support the trial court's denial of the motion to suppress the confession, appellate counsel was not deficient for failing to raise the suppression issue on appeal.  Moreover, he cannot show that there is a reasonable probability he would have prevailed on appeal if the issue had been raised. *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir.2001); *see also Smith*, 528 U.S. at 286.

For the foregoing reasons, Roberts has failed to demonstrate that the state court's decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Thus, under the AEDPA's doubly deferential standard applicable to ineffective assistance claims, the claims should be rejected.

## **RECOMMENDATION**

**IT IS RECOMMENDED** that Roberts' application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and

recommendation in a magistrate judge's report and recommendation within fourteen (14)

days after being served with a copy shall bar that party, except upon grounds of plain error,

from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United*

*Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc).[28]

     New Orleans, Louisiana, this 28th day of _____ October ___, 2015.

                             **MICHAEL B. NORTH**
                  **UNITED STATES MAGISTRATE  JUDGE**

---

[28] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.